**In the Matter of Jimmy Irvin THOMP-
SON, d/b/a DET Industrial
Fabricators, Bankrupt.**

**No. 72–H–119.**

United States District Court,
S. D. Texas,
Houston Division.

June 29, 1976.

Charles M. Bardwell, Houston, Tex., for appellant.

Herbert Finkelstein, Houston, Tex., for appellees.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

This is an appeal in bankruptcy of an order entered by the Honorable E. H. Patton, Jr., Bankruptcy Judge, on July 3, 1974, denying bankrupt-appellant's motion that appellees, a secured creditor and its attorney, be found in civil contempt for alleged violations of the Bankruptcy Court's Order

of Discharge. The question raised is whether appellees, by sending letters to the appellant threatening civil and criminal action against him if an earlier-discharged debt was not paid, acted in contravention of section 14f(2) of the Bankruptcy Act, 11 U.S.C. § 32(f)(2) (1970), which was recited in full in the Order of Discharge and enjoined all creditors from "instituting or continuing any action or employing any process" to collect a previously-discharged debt as a personal liability of the bankrupt. The question is apparently one of first impression. Having carefully reviewed the legislative history of section 14f(2), the arguments of counsel, and the lower court's Memorandum and Order, this Court is of the opinion that the bankruptcy judge's order denying appellant's contempt motion was legally correct and should be affirmed. Before reaching the legal question presented, a review of the facts, which are not in issue, is a necessary starting point.

## I. FACTUAL BACKGROUND

Jimmy I. Thompson, d/b/a DET Industrial Fabricators filed a voluntary petition in bankruptcy on March 31, 1972. Appellee First National Bank of Lake Jackson, Texas (the Bank), was scheduled by the bankrupt debtor as a secured creditor with a $5,000.00 claim. Upon receiving notice of the upcoming meeting of creditors, the Bank retained appellee Everett S. Stovall to represent it in the bankruptcy proceedings.

Stovall filed a proof of claim in the amount of $4,200.00 on behalf of the Bank. Although appellees viewed the debt as arising out of the fraud of the bankrupt, they did not seek an exception to discharge under section 17 of the Bankruptcy Act, 11 U.S.C. § 35 (1970), nor did they file an objection to discharge of the indebtedness, as provided in section 14 of the Act, 11 U.S.C. § 32 (1970). Thereafter, on May 24, 1972, the bankruptcy judge entered an Order of Discharge which released the bankrupt-appellant from his obligations incurred prior to the filing of the voluntary petition, including the debt owing to the Bank. The

Order of Discharge incorporated § 14f(2) of the Act, directing that "all creditors whose debts are discharged by this order are enjoined from instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt . . . ."

On July 29, 1972, some two months following the discharge, Stovall wrote to appellant on behalf of the Bank. The letter informed Thompson that because the Bank considered the debt to have arisen out of fraudulent conduct on the part of appellant, the Bank intended to institute legal action to recover the $4,200.00 amount if the debt was not paid within ten days. In describing the legal means to be used if appellant failed to comply, Stovall announced that the Bank would pursue criminal remedies "in an effort to see that proper criminal charges are brought against you for this fraud". A follow-up letter dated August 16, 1972, specified the alleged criminal violations as swindling and theft by false pretext, and stated that:

> "[i]n the event that this matter cannot be satisfied through civil process and in the event that satisfactory arrangement is not made of this past due amount within 10 days of the above date, I will have no alternative but to suggest criminal proceedings be instituted against you in connection with these charges as well as civil proceedings in an attempt to collect this past due amount."

Appellant did not respond to the letters, nor did he take any action to satisfy the previously-discharged debt.

Although no civil action was filed by appellees, criminal charges were indeed brought by the State of Texas and appellant was found not guilty. Thereafter, appellant instituted an action against appellees in state court on a "malicious prosecution" theory, the outcome of which is unknown and not relevant to the instant inquiry. Appellant also filed a motion in the bankruptcy court that the Bank and Stovall be held in contempt of the Order of Discharge.

Following a hearing on the contempt motion, the bankruptcy judge entered a written order concluding that "although the letters and threats exceed the bounds of ethical conduct,[1] they do not constitute action or process enjoined by the Court's Order". Order and Memorandum on Motion for Contempt, at 13 (July 3, 1974) (footnote added). This Court agrees with the lower court's interpretation for the reasons hereinafter set out.

## II. INTERPRETATION OF SECTION 14f(2) OF THE BANKRUPTCY ACT

Subdivision (f) of section 14 of the Bankruptcy Act, added to the Act in 1970, provides:

"An order of discharge shall—

"(1) declare that any judgment theretofore or thereafter obtained in any other court is null and void as a determination of the personal liability of the bankrupt with respect to any of the following: (a) debts not excepted from the discharge under subdivision (a) of section 17 of the Act; (b) debts discharged under paragraph (2) of subdivision (c) of section 17 of this Act; and (c) debts determined to be discharged under paragraph (3) of subdivision (c) of section 17 of this Act; and

"(2) enjoin all creditors whose debts are discharged from thereafter instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt."

1. Canon 7–105 of the Code of Professional Responsibility for the State Bar of Texas provides:
   "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."
   Both at the contempt hearing and in the Order and Memorandum of July 3, 1974, the bankruptcy judge reprimanded appellee Stovall for his outright violation of Canon 7–105.

2. In *Train v. Colorado Public Interest Research Group, Inc., supra,* the Supreme Court relied exclusively on the legislative history of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1972), in its effort to define the meaning of the term "pollutant". The Court of Appeals for the Tenth Circuit had employed the "plain meaning" doctrine of statutory construction and concluded that resort to the act's legis-

11 U.S.C. § 32(f) (1970).

The sole question before this Court is the scope of the statutory language contained in subdivision (2). Appellant argues that the subdivision not only prohibits a creditor from utilizing legal means to collect a discharged debt, but also bars informal methods of collection which threaten legal action unless the debt is paid. Appellant thus contends that the term "process" as used in § 14f(2) should not be limited to its strict legal meaning, but should be construed broadly to encompass the coercive methods employed in this case.

### A. Legislative Purpose of Section 14f

■ In support of his position, appellant points to language in the amendment's legislative history that

"the major purpose of the proposed legislation is to effectuate, more fully, the discharge in bankruptcy by rendering it less subject to abuse by harassing creditors."

Although the Court disagrees with appellant's conclusion that a liberal interpretation of the provision accords with congressional intent, the Court does agree with appellant that the primary tool in drawing the contours of statutory language is an examination of its legislative history. *See Train v. Colorado Public Interest Research Group, Inc.,* —— U.S. ——, 96 S.Ct. 1938, 48 L.Ed.2d 434, 44 U.S.L.W. 4717 (1976). This is especially true when the phrase in issue is undisputably ambiguous.[2]

lative history was unnecessary because the word "pollutant" has an unambiguous meaning. 507 F.2d 743, 746–47. The Supreme Court rejected the Court of Appeals absolute reliance on this traditional doctrine and stressed that

"[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'."

—— U.S. at ——, 96 S.Ct. at 1939, 44 U.S.L.W. at 4719, *quoting United States v. American Trucking Assns.,* 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

The Supreme Court has thus undercut even further the viability of the "plain meaning" doctrine and its requirement that language be "ambiguous" before any resort to legislative history is legally proper. *See generally* Mur-

■ Section 14f was part of a 1970 legislative package described by Representative Wiggins as "the most important piece of bankruptcy legislation which has been considered by the House in at least five years". 116 Cong.Rec. 34818 (1970). The legislative aim was twofold: to update the process of obtaining, or opposing, a discharge of the debtor's outstanding monetary obligations in bankruptcy; and to vest exclusive jurisdiction in the bankruptcy court to determine both the debtor's right to a discharge and the effect of a discharge once granted. *See* H.R.Rep. No. 91–1502, 91st Cong. 2d Sess. (1970), 2 U.S.Code Cong. & Admin. News, pp. 4156–57 (1970) (hereinafter House Report); *Explanatory Memorandum to Accompany S. 4247,* 116 Cong.Rec. 34818–20 (October 5, 1970) (hereinafter "*Memorandum*"). Sections 14 and 17, the two principal discharge provisions in the Act, were broadened in an effort to place all disputes pertaining to dischargeability within the exclusive jurisdiction of the bankruptcy court for complete and final resolution. *See* House Report, *supra; In re Hinchey,* 349 F.Supp. 116 (D.Or.1972); *In re Kaid,* 347 F.Supp. 540 (E.D.Va.1972).

■ Section 14f was adopted to rid the discharge process of a prevalent pre-1970 abuse. As described by the drafters:

"Under present law creditors are permitted to bring suit in State courts after a discharge in bankruptcy has been granted and many do so in the hope the debtor will not appear in that action, relying to his detriment upon the discharge. Often the debtor in fact does not appear because of such misplaced reliance, or an inability to retain an attorney due to lack of funds, or because he was not properly served. As a result a default judgment is taken against him and his wages or property may again be subjected to garnishment or levy. All this results because the discharge is an affirmative defense which, if not pleaded, is waived.

phy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the*

"S. 4247 is meant to correct this abuse. Under it, the matter of dischargeability . . . will be within the exclusive jurisdiction of the bankruptcy court."

House Report, *supra,* at p. 4156. *See also* 1A Collier on Bankruptcy ¶ 14.69, at 1452–53 (14th ed. 1976) (hereinafter Collier).

Thus, section 14f, which must be included in the bankruptcy court's order of discharge, was enacted to prevent a creditor from obtaining collateral judicial relief in another forum on a debt previously discharged by the bankruptcy court. Subsection 14f(1) declares that any subsequent judgment on a discharged debt has no legal effect. A companion subsection (2) instructs all creditors who hold discharged debts not to institute or maintain any subsequent legal action or process to collect the debt. By expressly cutting off alternative legal avenues, section 14f contributes to the overall goal of the 1970 amendments by requiring creditors to voice any opposition to the proposed discharge during the course of the federal bankruptcy proceeding. *See* 1A Collier, *supra* ¶ 14.69, at 1452–54.

### B. Types of Conduct Enjoined by § 14f(2)

■ The legislative history makes it clear that Congress sought to stop legal, as opposed to informal, means of post-discharge debt collection. In the memorandum accompanying the proposed bill, the drafters remark that inclusion of § 14f eliminates "harassment lawsuits" and the need for the bankrupt

"to retain legal assistance in another court to assert his discharge and [permits the bankrupt] to be unburdened from the effects of judgments which today are not rightfully obtained either through default or sewer service."

*Memorandum, supra* at 34820. At another point, the memorandum declares that the two directives in § 14f

*"Modern" Federal Courts,* 75 Colum.L.Rev. 1299 (1975).

"render it unnecessary for a bankrupt to raise [the discharge] as an affirmative defense in a later State court action . . . ."

*Id.* at 34819. Noticeably, the major bankruptcy treatise has interpreted the phrase "employing any process," to refer to the use of garnishment or attachment writs. 1A Collier, *supra* ¶ 14.69, at 1454.

Moreover, the drafters do refer to non-legal means employed by creditors to recover the value of previously-discharged debts. The explanatory memorandum notes that

"This proposed legislation also does not affect in any way a bankrupt's obligation upon a discharged debt which is subsequently revived by a new promise. In the absence of any statutory directive, the case law has permitted enforcement of such new promise made after the commencement of the bankruptcy proceeding."

*Memorandum, supra* at 34819. By acknowledging the continued legal vitality of the process whereby creditors obtain reaffirmations from debtors to pay discharged debts, *see* 1A Collier, *supra* ¶¶ 17.33–.38, at 1753–64, Congress necessarily upheld the informal collection practices, especially in the form of threatening letters, which creditors utilize to extract these new promises.

### C. Conclusion

Therefore, this Court concludes that § 14f(2) only proscribes further legal action by creditors once the bankrupt is granted a discharge and does not enjoin the use of non-judicial methods.[3] Accordingly, although the methods employed by appellees in this case are inexcusable and in obvious disregard of the purposes of the Bankruptcy Act to give the bankrupt a "fresh start," the Court is of the opinion that appellees cannot be held in technical

contempt of the bankruptcy court's discharge order.

### III. THE CRIMINAL ACTION

Appellant's argument that appellee's role in the bringing of criminal charges against him constitutes "action" or "process" within the meaning of § 14f(2) is without merit. The section prohibits creditors themselves from engaging in future legal activities to collect a discharged debt as a personal liability of the bankrupt. It does not proscribe state criminal prosecutions against bankrupts based on a debt discharged in bankruptcy. Given this Court's technical interpretation of the term "process," any possible nexus between appellee's activities in attempting to collect on the discharged debt and the later bringing of state criminal charges is insufficient to bring appellee's conduct within the prohibition of § 14f(2). However, as pointed out in note 1, *supra*, an attorney's utilization of the criminal process to improve his client's position in a civil matter constitutes an unethical practice.

Accordingly, the Court ORDERS, ADJUDGES and DECREES that judgment should be had for appellees and that this appeal should be, and it hereby is, dismissed.

---

**3.** In view of the Court's ruling on the limited scope of § 14f(2), there is no need to consider appellant's further argument that the bankruptcy court improperly refused to order disclosure of certain written communications between the Bank and Stovall, claimed by appellees to be protected by an attorney-client privilege. Even if the documents had been ordered disclosed, their contents would have no bearing on the lower court's or this Court's determination that appellees did not act in technical contempt of the order of discharge.