Robert **GIRARDIER** and Susan L. **Luzkow, Appellants,**

v.

**WEBSTER COLLEGE, Appellee.**

No. 76–1922.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1977.

Decided Aug. 24, 1977.

Ronald S. Preuss (argued), and Frank Susman (made rebuttal), St. Louis, Mo., filed brief for appellants.

Wayne L. Millsap, St. Louis, Mo., argued and filed brief for appellee.

Before BRIGHT and ROSS, Circuit Judges, and URBOM, District Judge.*

URBOM, Chief District Judge.

The issue here is whether a college may refuse to release transcripts of credits to former students for the sole reason that those students have not repaid to the college their National Defense Education Act loans and have obtained discharges in bankruptcy of those loans.

The plaintiff Robert Girardier took out a National Defense Student Loan with the defendant, Webster College, under Subchapter II of the National Defense Education Act, 20 U.S.C. §§ 421–429. He received his bachelor's degree in May, 1972. Thereafter, that plaintiff defaulted on the loan and filed bankruptcy papers, listing the college as an unsecured creditor in the sum of $1,500.00. He was subsequently discharged in bankruptcy from the payment of the loan.[1] At a later time he applied to the defendant for a transcript of his undergraduate credits, tendering the $2.00 fee therefor. The defendant refused, for the sole reason that the plaintiff owed the defendant $1,500.00 from the plaintiff's discharged student loan, citing a provision in the college handbook that "No transcript is released until all accounts are paid." Counsel for the defendant admits that, if the plaintiff were to pay the obligation in full, the college would furnish the requested transcript.[2] The plaintiff alleges that a transcript is necessary for him to receive his master's degree, to which he is otherwise entitled, from the University of Missouri-St. Louis.

The plaintiff Luzkow is in an almost identical posture. Sometime after receiving her bachelor's degree from Webster College in May, 1973, she too defaulted on her National Defense Student Loan. She filed bankruptcy, listing the college as an unsecured creditor in the amount of $1,900.00, and was subsequently discharged. She then sought copies of her college transcript, and the defendant similarly refused her request. She alleges that she needs a transcript as a necessary part of her applications to graduate school.

Although the complaints were filed separately, they have been dealt with by the parties and the district court as if consolidated. The Girardier complaint seeks damages only, while the Luzkow complaint asks for declaratory, injunctive, and monetary relief.

---

* WARREN K. URBOM, Chief Judge of the United States District Court for the District of Nebraska, sitting by designation.

1. Future discharges of such educational debts will be governed by 20 U.S.C. § 1087–3, enacted into law as § 439A of the "Education Amendments of 1976," P.L. 94–482. It states:

 (a) A debt which is a loan insured or guaranteed under the authority of this part may be released by a discharge in bankruptcy under the Bankruptcy Act only if such discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of commencement of the repayment period of such loan, except that prior to the expiration of that five-year period, such loan may be released only if the court in which the proceeding is pending determines that payment from future income or other wealth will impose an undue hardship on the debtor or his dependents.

 (b) Subsection (a) of this section shall be effective with respect to any proceedings begun under the Bankruptcy Act on or after September 30, 1977.

 That section had previously been proposed as Section 4–506(a)(8) of the draft revisions to the Bankruptcy Act—that drafted by the Commission on the Bankruptcy Laws of the United States (H.R. 31, 94th Cong. 2nd Sess. 1976) and that by the National Conference of Bankruptcy Judges (H.R. 32, 94th Cong. 2nd Sess. 1976)—as one of the exceptions from discharge.

 For conflicting views of the magnitude of such defaults, see Hearings Before the Subcommittee on Civil and Constitutional Rights of the Committee of the Judiciary, 94th Cong. 2nd Sess. on H.R. 31 and 32—Bankruptcy Act Revision—1976, particularly pp. 1065–1139. See also, Lee "A Critical Comparison of the Commission Bill and the Judges' Bill for the Amendment of the Bankruptcy Act," 49 Am.Bankr. L.J. 1, 26 (1975).

2. No issue is presented regarding the entitlement of the college to recovery from the Commissioner of Education under 20 U.S.C. § 1080(a) for the loss sustained by it.

## I. JURISDICTION

 Among the jurisdictional grounds alleged is that of the presence of a federal question, articulated in 28 U.S.C. § 1331(a), which grants to federal district courts jurisdiction of all civil actions exceeding in value $10,000, exclusive of interest and costs, and arising under the laws of the United States. If these controversies arise under the laws of the United States, the district court had jurisdiction.

The claims of the plaintiffs, as stated in their complaints, are not merely that under state law the college is obligated to provide transcripts of credits earned, but rather that the college's reliance upon nonpayment of loans as the reason for refusal to furnish transcripts is in contravention of the federal Bankruptcy Act. The plaintiffs sue on the theory that they acquired rights from the Bankruptcy Act which the college has violated. Whether the Act afforded such right to the plaintiffs is a matter of interpretation of a federal law and is thus a federal issue.

In *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the court interpreted the statute which is now 28 U.S.C. § 1331(a), saying:

Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. * * * [A] suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of ob-

taining jurisdiction or where such a claim is wholly insubstantial and frivolous. The accuracy of calling these dismissals jurisdictional has been questioned. *The Fair v. Kohler Die Co.,* * * * 228 U.S. [22] at 25, [33 S.Ct. [410] at page 411, 57 L.Ed. 716]. But cf. *Swafford v. Templeton,* * * * [185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005].[3]

As framed by the pleadings and as briefed and argued on appeal, the core of the issue is whether a discharge under the Bankruptcy Acts forbids the withholding by creditors of benefits they otherwise would grant but for the failure to pay the indebtedness listed in the bankruptcy petition. The college in its brief to this court acknowledges that, "Thus the determination of the issue at bar rests solely on the interpretation of the meaning and intent of the federal Bankruptcy Act and the effect of a discharge thereunder."[4] The issue of the effect of a discharge is not immaterial and made solely for the purpose of obtaining jurisdiction. Upon analysis of the merits of the issue, we conclude that the issue is not wholly insubstantial or frivolous. Jurisdiction thus lodged in the district court.

Because substantiality of the federal issue depends upon the degree of plausibility of its merits, and because counsel have briefed fully the merits, we proceed to them.

## II. STATE OF THE BANKRUPTCY LAW PRIOR TO 1970

Prior to 1970 there was sound authority for inflicting various hardships on bankrupts following their discharge, based solely on the fact of bankruptcy. Indeed, the Supreme Court of the United States had twice sanctioned such hardships in the area of motorists' financial responsibility laws.

*Reitz v. Mealey,* 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941), considered a New York law which provided a suspension of one's driver's license and auto registration by reason of his or her nonpayment of a judg-

---

**3.** See also, *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936).

**4.** Appellee's brief, p. 9.

ment for injury resulting from the operation of a motor vehicle. The statute provided that a discharge in bankruptcy would not remove this suspension. The court found no conflict between this statute, which it found a valid exercise of the state's police power designed to enforce a public policy that irresponsible drivers shall not with impunity be allowed to injure others, and 11 U.S.C. § 35, the discharge provision of the Bankruptcy Act. Four justices dissented on the ground that the New York statute was in conflict with the purpose of the Bankruptcy Act, as expressed in *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), of giving the bankrupt "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."

In *Kesler v. Dept. of Public Safety,* 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962), the court confronted a Utah statute which was similar to New York's in *Reitz* but which gave the individual creditor greater control over the sanctions to be imposed by the state for the nonpayment of the judgment. Justice Frankfurter, writing for the court, discussed the discharge provisions and their consequences thus:

> Section 17 of the Bankruptcy Act, 11 U.S.C. § 35, provides that "A discharge in bankruptcy shall release a bankrupt from all of his provable debts," with exceptions not here material. See also 11 U.S.C. § 1(15). A discharge relieves the bankrupt "from legal liability to pay a debt that was provable," *Zavelo v. Reeves,* 227 U.S. 625, 629, [33 S.Ct. 365, 367, 57 L.Ed. 676] (1913); it is a valid defense in an action brought in a state court to recover the debt. A State cannot deal with the debtor-creditor relationship as such and circumvent the aim of the Bankruptcy Act in lifting the burden of debt from a worthy debtor and affording him a new start. The limitations imposed upon the States by the Act raise constitutional questions under the Supremacy Clause, Art. VI. Thus, a discharge does not free the bankrupt from all traces of the debt, as though it had never been incurred.

This Court has held that a moral obligation to pay the debt survives discharge and is sufficient to permit a State to grant recovery to the creditor on the basis of a promise subsequent to discharge, even though the promise is not supported by new consideration. *Zavelo v. Reeves, supra.* The theory, the Court declared, is that "the discharge destroys the remedy but not the indebtedness," 227 U.S., at 629, [33 S.Ct. [365] at 367]. And in *Spalding v. New York ex rel. Backus,* 4 How. 21, [11 L.Ed. 858] (1846), under an earlier bankruptcy law, the Court held that a discharge did not prevent the State from collecting a fine for contempt in violation of an injunction issued to aid in the execution of a judgment debt, although the fine was turned over to the creditor. States are not free to impose whatever sanctions they wish, other than an action of debt or assumpsit, to enforce collection of a discharged debt. *But the lesson* Zavelo *and* Spalding *teach is that the Bankruptcy Act does not forbid a State to attach any consequence whatsoever to a debt which has been discharged.*" (Emphasis added) 369 U.S. at 169–171, 82 S.Ct. at 817–81.

The court upheld the law on the same theory as that expressed in *Reitz.*

Furthermore, prior to 1970 there was nothing in the Bankruptcy Act to prohibit a wide variety of acts by private parties (including the bringing of actions on the debt in state court) aimed at inducing debtors to make payments on their discharged obligations or to make promises which would revive the debt. Although not specifically dealt with in the Bankruptcy Act, the courts have long permitted such revival upon the making of a new promise to pay the debt. The theory is that a moral obligation sufficient to support a new promise to pay the debt remains even after the discharge. *Zavelo v. Reeves,* 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676 (1913). The criteria for revival depend upon local law. See 8 *Remington on Bankruptcy,* §§ 3288–3298. A full discussion of the scope of acts that can be taken by a creditor in order to

induce payments or promises sufficient to constitute revival of the debt would be beyond the scope of this opinion.

Suffice it to say that historically the protection afforded the bankrupt has been limited to discharge of liability for past debts. 11 U.S.C. § 35. Discharge is defined at 11 U.S.C. § 1(15):

> "Discharge" shall mean the release of a bankrupt from all of his debts which are provable in bankruptcy, except such as are excepted by this title;

The Supreme Court of the United States explains in *Zavelo v. Reeves, supra,* that "The theory is that the discharge destroys the remedy but not the indebtedness". As stated in *Kesler v. Dept. of Public Safety, supra,* the effect of a discharge was limited to providing a valid defense in a state court action to recover the debt. Thus, the bankrupt was left to fend for himself should an action be brought on a discharged debt in state court. If the bankrupt did not affirmatively plead the discharge, the creditor might be able to obtain a judgment against him or her.

Thus, it was clear that prior to 1970, a great variety of adverse consequences could be visited upon bankrupts and a great variety of payment-inducing schemes could be tried by the creditors, without any violation of the Bankruptcy Act or the Supremacy Clause.

## III. THE 1970 AMENDMENTS TO THE BANKRUPTCY ACT

[3] Along with provisions giving the bankruptcy court greater powers to determine the effect of discharge, Congress in 1970 passed 11 U.S.C. § 32(f)(2), which states:

> An order of discharge shall—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (2) enjoin all creditors whose debts are discharged from thereafter instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt.

The plaintiffs urge that the language, "employing any process," extends to cover the action of the defendant. They argue that the absence of the adjective "legal" before the word "process" implies a Congressional intent to include informal means of debt collection within the proscription of the statute.

We find no Congressional intent that the language be so broad. See 2 *U.S. Code Congressional & Administrative News,* pp. 4156–4157 (1970); Note, "Bankruptcy— 1970 Amendments to the Bankruptcy Act— An Attempt to Remedy Discharge Abuses," 69 Mich.L.Rev. 1347 (1971). In *Wood v. Fiedler,* 548 F.2d 216 (8th Cir. 1977), this court said:

> The 1970 amendments were enacted to prevent creditors from instituting state court actions in the hope that the bankrupt would ignore the proceedings based on a misplaced reliance on the discharge or due to a lack of funds to defend. 548 F.2d at 219.

That the 1970 amendments did not serve to prohibit nonlegal, informal means of inducing the debtor to make payment on or revive the discharged obligation is apparent from the legislative history. Just before passage of the bill, Professor Lawrence King's memorandum for the National Bankruptcy Conference was read into the record as the "Explanatory Memorandum to Accompany S. 4247" (the 1970 amendments), 116 Cong.Rec. 34818–34820 (October 5, 1970):

> This proposed legislation also does not affect in any way a bankrupt's obligation upon a discharged debt which is subsequently revived by a new promise. In the absence of any statutory directive, the case law has permitted enforcement of such new promise made after the commencement of the bankruptcy proceeding.

■ Furthermore, the word "process" itself implies court action. It is generally defined as the means by which a court compels the appearance of a defendant before it or by which the court compels a compliance with its demands. *Black's Law Dictionary* (Revised Fourth Edition 1968), p.

1370; *United States v. Kinney,* 264 F. 542 (E.D.Pa.1920); *United States v. Fore,* 38 F.Supp. 142 (S.D.Cal.1941); 72 C.J.S. Process § 1; *State v. Sullivan,* 245 Wis. 180, 13 N.W.2d 550 (1944). See 28 U.S.C. §§ 1691–1696.

In commenting on this section, the author of 1a *Collier on Bankruptcy* (14th ed. 1976), at ¶ 14.69, states:

> In essence, § 14 [11 U.S.C. § 32(f)] contains a two pronged attack on the problem. First, it declares that any judgment rendered on a discharged debt in any forum other than the bankruptcy court is null and void as it affects the personal liability of the bankrupt. Second, and perhaps more important, it contains an injunction prohibiting creditors holding discharged debts from (1) commencing any action on such debt; (2) continuing any such action already instituted; and (3) *employing any process to collect such debt, e. g., through the use of garnishment or attachment writs.* (Emphasis added)

Accord, *Matter of Thompson,* 416 F.Supp. 991 (S.D.Tex.1976).

The usual usage of "process" denotes activation of the formal legal machinery of a government but not refusals by a nonpublic person to act. Neither the legislative history nor the language of the Bankruptcy Act supports the plaintiffs' position.

### IV. *PEREZ v. CAMPBELL*

In 1971 the Supreme Court of the United States decided *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), centering upon the Arizona version of the motorists' financial responsibility laws. The statute specifically provided that a discharge in bankruptcy of a judgment against a motorist for injuries from an accident would not relieve the debtor of any of the requirements of the statute, including suspension of the driver's license and automobile registration.

The court examined whether the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." The court looked not to the stated purpose of the state statute, as it had in *Reitz, supra,* and *Kesler, supra,* but rather to the statute's effect. Because it found the effect to be "a powerful weapon for collection of a debt that has been released by operation of federal law," it found the statute inconsonant with the Bankruptcy Act and thus invalid under the Supremacy Clause of the United States Constitution.

It is important to note what the court did not decide in *Perez.* The majority states at 402 U.S. 642, 91 S.Ct. 1707–1708:

> Again, the validity of this limited requirement that some drivers [including bankrupts] post evidence of financial responsibility for the future in order to regain driving privileges is not questioned here.

The dissent states at 402 U.S. 668, 91 S.Ct. 1720:

> It is conceded that Arizona constitutionally could prescribe liability insurance as a condition precedent to the issuance of a license and registration.

The question of the effect of *Perez* is considered in Note, "Supremacy of the Bankruptcy Act: The New Standard of *Perez v. Campbell*," 40 Geo. Washington L.Rev. 764, 771–773 (1972). The author states:

> * * * The Act * * * does not purport to protect a bankrupt from all possible obstacles which he may encounter because of past failures. For example, actions taken against a bankrupt by private individuals or organizations which do not involve the machinery of the states are not prohibited, even though they may deprive the bankrupt entirely of his means of livelihood. * * *

This view has been supported by the lower court cases decided since *Perez.*

All rulings which have struck down adverse consequences inflicted on the bankrupt have involved state or local laws. *Rutledge v. City of Shreveport,* 387 F.Supp. 1277 (W.D.La.1975) (municipal civil service board rule resulting in a police officer's suspension for taking bankruptcy held un-

constitutional under the Supremacy Clause); *Matter of Loftin,* 327 So.2d 543 (La.App.1976) (Shreveport Fire Department policy resulting in suspension of bankrupt firemen held unconstitutional under the Supremacy Clause); *Grimes v. Hoschler,* 12 Cal.3d 305, 115 Cal.Rptr. 625, 525 P.2d 65 (1974) (California statute which resulted in suspension of a bankrupt contractor's license held unconstitutional under the Supremacy Clause).

The courts appear not to have gone beyond this, however. In *Marvin Tragash Co. v. U. S. Department of Agriculture,* 524 F.2d 1255 (5th Cir. 1975), the court held that 7 U.S.C. § 499b(4) does not conflict to an improper degree with the Bankruptcy Act, following the reasoning of *Zwick v. Freeman,* 373 F.2d 110 (2nd Cir. 1967). The former section, a part of the Perishable Agricultural Commodities Act, aiming at ensuring financial responsibility by those involved in the purchase and sale of perishable agricultural commodities, provides for the imposition of penalties for failure to make full payment promptly, irrespective of the violator's having obtained a discharge in bankruptcy. Similarly, *House v. O'Grady,* 35 Ohio Misc. 20, 299 N.E.2d 706 (1973), acting on the express limitations in *Perez,* concluded that the requirement of posting by bankrupts of proof of financial responsibility for future accidents as a condition to holding drivers' licenses is not at odds with the Bankruptcy Act.

The private-action-versus-state-action distinction was specifically recognized in *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 929 (5th Cir. 1977) (en banc, vacating Part III of the panel opinion, 526 F.2d 870 (1976)). In considering whether an employee could be discharged from private employment solely because he filed a petition in voluntary bankruptcy, the court said:

> We find no law which restrains [the employer] from firing an employee because he has filed a petition in voluntary bankruptcy. No statutory provision shields a bankrupt from later economic consequences visited upon him by private individuals, whether acting alone or in concert. A thorough examination of the Bankruptcy Act and its legislative history discloses no explicit provision or intent to prohibit discriminatory action against an individual on the basis of his declaring bankruptcy. In addition, no such Congressional intent can be reasonably inferred from the statute as it is now enacted. Nor can such a right be legitimately implied from the Constitution's Bankruptcy Clause itself. As has been pointed out, that empowering provision speaks only in discretionary terms and does not afford any individual a right which Congress has not specifically legislated.

In footnote 57 the *McLellan* court distinguished the *McLellan* issue from that in *Perez v. Campbell, supra,* by saying, "Here, of course, purely private action is involved."

## V. BANKRUPTCY ACT POLICY

In providing a uniform system of bankruptcy, Congress has made fundamental policy of the Act the providing of a means for (1) the effective rehabilitation of the bankrupt and (2) the equitable distribution of the bankrupt's assets among his creditors. *Bostwick v. United States,* 521 F.2d 741, 746, n. 13 (8th Cir. 1975); see Report of the Commission on the Bankruptcy Laws of the United States, H.R. 137, 93rd Cong. 1st Sess. (July 1973).

It is true that the first purpose has been variously stated as giving the debtor a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *Local Loan Co. v. Hunt, supra; Lines v. Frederick,* 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Perez v. Campbell, supra.* The court in *Lines* said:

> The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act.

But that does not necessarily mean that every conceivable mechanism for furthering

this goal has been written into the Act so as to become law. Historically, the Congress has rested on the discharge provisions of the Act to effectuate this goal; as of 1970, the Congress has further implemented this goal by the injunctive provisions of 11 U.S.C. § 32(f)(2). The Supreme Court of the United States has extended this protection by striking down state laws which create "a powerful weapon for collection of a debt [that has] been released by [operation of] federal law." *Perez, supra.* But this is as far as the Congress or the courts have gone. The plaintiffs urge that they are entitled to be treated in a nondiscriminatory manner by reason of their bankruptcy, unless the disparity in treatment is rationally supported. This may be a proper legislative end for the Congress to consider, but it is not the present law.

It is an axiom of statutory construction that respect should be paid to the limits to which Congress was prepared to go to enact a particular policy, especially when the boundaries of a statute were drawn in compromise from countervailing pressures of other policies. *United States v. Sisson,* 399 U.S. 267, 297, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970); *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

An indication of the Congress' concern over the infliction of adverse consequences on the bankrupt and an indication of the prior state of the law may be found in the proposed new bankruptcy acts—one drafted by the Commission on the Bankruptcy Laws of the United States[5] and one by the National Conference of Bankruptcy Judges.[6] Both contain identical section 4–508's:

A person shall not be subjected to discriminating treatment because he, or any person with whom he is or has been asso-

ciated, is or has been a debtor or has failed to pay a debt discharged in a case under this title. This action does not preclude consideration, where relevant, of factors other than those specified in the preceding sentence, such as present and prospective financial condition or managerial ability.

We offer no suggestion as to whether this proposed section would relate to private, as well as state, action. The National Bankruptcy Conference has proposed an amendment to the proposed new section 4–508 which would limit the section to state action.[7]

The drafts of proposals of the Commission on the Bankruptcy Laws of the United States and of the National Conference of Bankruptcy Judges also contain identical section 4–507's:

EFFECT OF DISCHARGE.—
(a) REVIVAL OF REAFFIRMATION OF A DEBT EXTINGUISHED BY DISCHARGE.—Except as provided in sections 4–504(b) and 4–506(b) and notwithstanding any other law to the contrary, a debt extinguished by discharge under section 4–505 shall not be revived or reaffirmed or be all or part of any bargain creating a new debt. Any judgment, whenever obtained, that a debtor is personally liable to pay a debt extinguished by discharge is null and void.

The exceptions noted relate to contracted-for reaffirmations in connection with an agreement to redeem secured property or to settle litigation over the dischargeability of a debt.

The Report of the Commission on the Bankruptcy Laws of the United States[8] comments thus:

The present Act does not attempt to deal with the problem of reaffirmation of dis-

---

5. H.R.31, 94th Cong. 2nd Sess. (1976).

6. H.R.32, 94th Cong. 2nd Sess. (1976).

7. See Hearings on H.R. 31 and 32 before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 94th Cong. 1st and 2nd Sess., Appendix, at 357 (1975 and 1976). *Committee hearings on the*

proposed section evoked extensive discussion. *One of the oft-voiced criticisms is the potential flood of litigation, especially as against private lenders of money.*

8. Report of the Commission on the Bankruptcy Laws of the United States, H.R. 137, 93rd Cong. 1st Sess. (July 1973).

charged debts. Substantial evidence of the use of reaffirmations to nullify discharges has come to the Commission's attention. To the extent reaffirmations are enforceable, the "fresh start" goal of the discharge provisions is frustrated. Reaffirmations are often obtained by improper methods or result from the desire of the discharged debtor to obtain additional credit or continue to own property securing a discharged debt. The Commission has recommended that the reaffirmation of a secured debt be enforceable but only to the extent of the fair market value of the property at the date of the petition. The Commission also recommends that a discharge extinguish all nonexcepted debts, reaffirmations be made unenforceable, and as under the present law, a judgment for a discharged debt be null and void.

These proposals for new legislation acknowledge that the present Bankruptcy Act does not fully implement a "fresh start" policy, and the proposals seek to reach nearer to that goal. How near the goal to go in the future is a proper subject of legislative inquiry, but for now the courts, including this court in this case, must go only as far as Congress has described.

The Bankruptcy Act, as now written, does not prohibit a private college's refusing to furnish transcripts to persons who have received a discharge in bankruptcy of their college loans.

## VI. THE BUCKLEY/PELL AMENDMENT

 The plaintiffs have also sought relief under 20 U.S.C. § 1232(g), the "Buckley/Pell Amendment." In relevant part, the statute reads:

(a)(1)(A) No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children. If any material or document in the education record of a student includes information on more than one student, the parents of one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to the education records of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.

\* \* \* \* \* \*

(d) For the purposes of this section, whenever a student has attained eighteen years of age, or is attending an institution of postsecondary education the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

\* \* \* \* \* \*

(f) The Secretary, or an administrative head of an education agency, shall take appropriate actions to enforce provisions of this section and to deal with violations of this section, according to the provisions of this chapter, except that action to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with the provisions of this section, and he has determined that compliance cannot be secured by voluntary means.

The other sections of the Act deal with the circumstances under which records may be released, again preceded by the directive that no funds shall be made available if violative actions are taken.

The statute does not say that a private remedy is given. Enforcement is solely in the hands of the Secretary of Health, Edu-

cation and Welfare under subsection (f).[9] Under such circumstances, no private cause of action arises by inference. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

## VII. *Disposition.*

The judgment of the district court is vacated and the action is remanded to that court with directions to dismiss the complaints for failure to state a claim on which relief may be granted.

BRIGHT, Circuit Judge, concurring:

While I am satisfied to concur in the result of the case, I do not agree with the rationale offered by the court. Given the facts of this case, the private action versus state action distinction is not warranted by *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), and its use may lead to inconsistent results, depending upon whether the creditor college is a public or private institution.

Under the court's analysis, Webster College may validly refuse to issue transcripts to former students who have discharged loan obligations through bankruptcy for the sole reason that it is a private college. Because it is a private rather than public institution, its refusal to issue transcripts is a "nonlegal, informal means of inducing the debtor to make payments," at 1272, and not state action standing " 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' " which are embodied in the Bankruptcy Act. *Perez v. Campbell,* 402 U.S. at 649, 91 S.Ct. [1704] at 1711, *quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

Assuming *arguendo* that a public institution's refusal to issue a transcript is a state action conflicting with the purposes and provisions of the Bankruptcy Act and vulnerable under the Supremacy Clause, the court's rationale could lead to the anomalous result that a state school is obligated to furnish transcripts to a bankrupt former student but, until he or she pays the discharged educational loan, a private school is not.

The *Perez* holding does not require such antithetical results. *Perez* presented the issue of whether an Arizona statute that took away a bankrupt's privilege, namely the license to drive, conflicted with the debtor discharge provisions of section 17 of the Bankruptcy Act, 11 U.S.C. § 35 (1970). As the court today observes, at 1273, the effect of the Arizona statute was to give judgment creditors a powerful weapon with which to force bankrupts to pay their debts despite their discharge. The statute acted to deny the "fresh start" contemplated by the bankruptcy laws, *see, e. g., Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Williams v. United States Fidelity and Guaranty Co.,* 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915), and, accordingly, it was struck down by the Supreme Court.

A college transcript differs radically from the essential driver's license at stake in *Perez.* A student who obtains a degree from a college acquires not only the present benefit of that education, but also a fund of knowledge of lifelong value. In other words, it is not like purchasing an article of consumable goods that immediately is consumed or even durable goods with more lasting usefulness. Instead, an education yields ever-continuing benefits.

Webster College, which has conferred upon now-bankrupt, former students an education represented by a degree, has taken no steps to penalize appellants in their use

9. As part of the introduction of the bill, the introducers issued a Joint Statement in Explanation of the Buckley/Pell Amendment, reported at 120 Cong.Rec. 21487, December 13, 1974. It states:

\* \* \* The Secretary of Health, Education and Welfare is charged with enforcement of the provisions of the Act, and failure to comply with its provisions can lead to withdrawal of Office of Education assistance to the educational agency or institution.

of knowledge gained in college, nor has it sought to prevent them from exhibiting a degree to the world at large. Rather, Webster College refuses further to enhance the benefit of those degrees by certification of the transcripts. That transcript represents far more in intangible worth than its mere two dollar cost of reproduction, for its embodies an additional certification of the debtors' already-received, but unpaid for, degrees, and provides the bankrupts with entry into graduate studies. Indeed, issuance of the transcripts affords these debtors a recommendation by the college of their intellectual worth.

Section 14 of the Bankruptcy Act speaks in terms of barring a creditor's affirmative action. The discharge bars ("enjoins") creditors whose debts are discharged from "instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt." 11 U.S.C. § 32(f) (1970). Additionally, *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), emphasizes the underlying primary purposes of the Bankruptcy Act to give debtors a fresh start, "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." [10]

I agree with appellants that the above-cited code section and the fresh start principle of *Local Loan Co. v. Hunt* should be applied generously and broadly in favor of the bankrupt. But in my view, neither the statute nor the fresh start principle applies here.

First, Webster College merely declined to confer any additional benefits upon the debtors by furnishing transcripts of their grades for the unpaid educational courses. Otherwise, it in no way coerced the debtors to pay the discharged debts. Second, appellants have obtained far more than the fresh start contemplated by the Bankruptcy Act—they have obtained a head start because each has secured something of value that cannot be lost or taken away and which will give each appellant a continuing, lifelong economic benefit. No college, public or private, should be required to enhance such a benefit by issuing a transcript when it has not been paid for its services. The equities here lie with the college.

I recognize that situations may arise where a student has received no substantial benefit from his or her education, but nevertheless needs a transcript, and I reserve judgment about such instances. Such is not the case in this appeal.

---

10. In *Local Loan Co. v. Hunt* a creditor argued that an assignment of future-earned wages to secure a loan was the equivalent of a lien, and should survive the discharge of the debt in bankruptcy. The Supreme Court held against the creditor, ruling that even if it were a lien under state law, it would conflict with the policy of the Bankruptcy Act and therefore did not survive discharge. The situation presented in this case bears no resemblance to *Local Loan Co.* There the "fresh start" goal of the Bankruptcy Act was completely undercut by a state law that created security interests in future earnings. Here the debtors not only have a "fresh start" by virtue of the discharge of their educational debts, but they retain the goods, namely their education, for which the debts were incurred. The only penalty they suffer is the loss of an additional benefit, a transcript that certifies and enhances the value of their education.