**UNITED STATES of America,**
**Libelant,**

v.

**ONE SOLID GOLD OBJECT IN FORM OF A ROOSTER, Libelee, Richard L. Graves, Claimant.**

**Civ. No. 1502.**

United States District Court
D. Nevada.
June 28, 1962.

See also D.C., 191 F.Supp. 198.

John W. Bonner, U. S. Atty., and Thomas R. C. Wilson, II, Asst. U. S. Atty., Reno, Nev., for libelant.

Laxalt & Laxalt, Paul D. Laxalt and Peter D. Laxalt, Carson City, Nev., for claimant.

HALBERT, District Judge.

This is a libel against libelee, one solid gold object in the form of a rooster, brought pursuant to the provisions of Title 31 U.S.C.A. § 441–446 (Gold Reserve Act of 1934). Trial having been had on the pertinent issues, a jury verdict was returned in favor of the claimant, Richard L. Graves. The Government (libelant) now moves for judgment notwithstanding the verdict, or, in the alternative, for a new trial.

The Court is satisfied that the jurors were justified in reaching the conclusions that they did concerning the facts of this case. The facts found by the jury will be summarized immediately following.

Richard L. Graves, at the times involved in this action, was the owner of certain properties in Sparks, Nevada. Included in these properties was the "Dick Graves Nugget Casino". As part of the operation of that establishment, Graves ran a dining room in which the specialty was fried chicken. This room was known as the "Golden Rooster Room". For various reasons, including, among others, the advancement of the interests of his business establishment, Graves developed the idea of acquiring, and showing, a solid gold rooster as a main object of attraction in this room. The rooster was to be in keeping with the theme of the room, would be cast with such refinement as to be considered an "object d'art", (The Government con-

ceded that the rooster is in fact an object of art) and would also attract potential customers through its quality of being a solid gold object.

In pursuance of this aim, certain negotiations occurred between Graves and Newman's Silver Shop (located in Reno, Nevada), by which Graves hoped that Newman's could create the rooster for him. Certain preliminary work was done by Newman's, specifically the carving of a wooden model upon which the form of the final cast object was to be based. At this same time, correspondence was exchanged between Newman's, John M. Laxalt of counsel for claimant, and the Director of the Mint in Washington, D. C. The object of this correspondence was to seek an increase in the amount of gold which Newman's was licensed to cast (Newman's had a 50 troy ounce limit, and the ultimate weight of the libelee was approximately 206 troy ounces.).

This exchange of correspondence did not achieve the results desired by Graves, and he was obliged to look elsewhere for someone to cast his rooster. He turned to Shreve & Co., of San Francisco. Graves advised Shreve & Co. of his prior negotiations with Newman's and of the failure of Newman's to secure a license to cast the desired amount of gold. Shreve's assured him that there would be no problem in producing his rooster, since Shreve's was already licensed to cast gold up to 300 ounces.

Graves, in his correspondence with the Department of the Mint in Washington, D. C., had been refused permission to cast his rooster by the office of the Director of the Mint, on the ground that the rooster, in the opinion of the office of the Director, did not constitute "fabricated gold", as that term is defined in the Treasury Regulations enacted pursuant to Title 31 U.S.C.A. § 442 . The term "fabricated gold" is defined in Title 31 C.F.R. § 54.4(a) (9) (i) as meaning,

" * * * processed or manufactured gold in any form (other than gold coin or scrap gold) which:

"(a) Has a gold content the value of which does not exceed 90 percent of the total domestic value of such processed or manufactured gold; and

"(b) Has, in good faith, and not for the purpose of evading or enabling others to evade the provisions of the acts, the orders, or the regulations in this part, been processed or manufactured for some one or more specific and *customary* industrial, professional or *artistic uses.*" (Emphasis added.)

The contention of the Department of the Mint was, and is, that the emphasized words, "customary" and "artistic uses", refer to artistic uses that are customary for gold, and that the formation of a solid gold rooster would not be a customary use of gold, notwithstanding the conceded fact that the rooster itself might be an object of art.

Testimony was conflicting as to whether this basis for the refusal by the Department to Graves of permission to cast his rooster was made clear to Shreve's, but the jury could have found, and apparently did find, from the evidence that such information was given during the course of negotiations between Graves and Shreve's.

Subsequent to the negotiations between Graves and Shreve's and after Shreve's had agreed to take all necessary steps in order to complete the processing of the rooster, a letter was written by J. C. Hickingbotham, Jr., of Shreve's, to the Director of the Mint, San Francisco, California. This letter sought permission for Shreve's to manufacture the rooster in question. It was delivered to Arthur C. Carmichael, who at that time was Superintendent of the San Francisco Mint. Carmichael endorsed a notation at the bottom of this letter, to the general effect that he saw no reason, under the applicable Regulations, to deny permission to Shreve's to manufacture the rooster. The letter, with the endorsement, was returned to Shreve's and the rooster was completed. As furnished to Graves, the rooster weighed some 206 troy ounces, and was of 18 karat gold.

It was subsequently impounded by the Government, pending this action.

■ The Court, after considering all of the evidence adduced at the trial, is convinced that there is adequate evidence from which the jury quite properly concluded that libelee was fabricated gold, as defined by the Regulations. For that reason, libelant's motion for judgment notwithstanding the verdict, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., will accordingly be denied.

The Government contends, in the alternative, that a new trial should be ordered, under the provisions of Rule 59 of the Federal Rules of Civil Procedure, on the grounds that the Court erred:

"(1) In refusing to admit into evidence testimony, which was offered by the United States, of witnesses James Murphy, Vance Kirkland, Spero Anargyros, and Leland Howard, for the purpose of establishing that the libelee was not manufactured or processed for a customary artistic use *for gold;* and

"(2) In instructing the jury that the libelee could be found to meet the customary artistic use test of the gold regulations if the jury found that the use to which the libelee was put was a customary use for artistic objects in general rather than that the jury would have to find that the libelee was a customary artistic use *for gold,* as the United States requested the Court to instruct in its proposed instructions Nos. 11 and 12." (Emphasis in motion.)

Thus, the problem raised by the fabricated gold requirement in this motion is concerned strictly with the "customary artistic use" test, and is not concerned with either the 90% test or the good faith test. (Insofar as the instant motions are concerned the Government does not attack the jury's finding in favor of claimant on the issue of good faith.)

■ The position of the Government appears to be that it is the customary use of gold, in objects of art, which are used as the rooster here was used, which is at issue. As previously indicated, the Government concedes that the rooster is an object of art. The basic reasons for the Government's claim that the use to which this rooster was put was not a "customary artistic" use include (1) the size of the rooster, (2) the fact that it is of solid gold, and (3) the fact that it is used for advertising and exhibition purposes. Included within this latter category is the fact that a great emphasis is laid, in the advertising of the rooster, on its monetary value and gold content.

Initially, it should be noted that the word "customary" modifies the words "artistic use". The importance of this observation can be seen in the fact that, by such construction, there is no requirement that the manufacture of the object, as opposed to its use, be customary. It may be that the method of manufacture of an object might be considered in connection with whether such object was manufactured in good faith, but there is no requirement that the method of manufacture, *per se,* be a customary method.

The above conclusion provides the basis for the determination reached by the Court on this issue. Since the regulations are concerned with "customary artistic use", and by the above construction are not concerned with whether the manufacture of the object was customary, the Government's contention, that the words "customary artistic use" refer to the issue of whether the use of the metal as cast and annealed into a solid gold rooster is a customary artistic use of gold, must fall. The word "use" refers to what is done with the completed object (in this case, the rooster), and not to what is done with the gold itself (that is, in making it into the solid form of rooster).

It is true, as the Government points out, that the Regulations with which we are concerned are intended to relate to gold in general. But it does not follow that merely because the general topic relates to gold, the entire section must be

construed to refer to gold alone, and to nothing else.

The Government contends that the above interpretation of the meaning of fabricated gold is not in harmony with other provisions of the Gold Regulations, specifically, with those which prescribe the conditions under which gold may be processed or manufactured and which are interrelated to the provision in question. The most forceful section cited by the Government in this connection is § 54.14 of Title 31 C.F.R., which provides that, with certain exceptions, gold situated outside the United States may be acquired, held, etc., by the United States nationals only to the extent permitted by licenses relating to the *legitimate and customary use of gold* in industry, profession or art issued under § 54.25. There is no doubt that the language of that section is intended to refer to a customary use of gold. But the very specificity of that language lends credence to the Court's conclusion that a different result was intended by § 54.4(a) (9) (i) (b). If it had been intended that the same construction should apply to fabricated gold in general, nothing could have been more simple than to have used the same language. The use of differing language necessarily implies a different connotation. The Court is fully satisfied that such was intended in the instant situation.

The Government argues that the construction set forth by the Court would do violence to the policy enunciated and intended by the Gold Reserve Act. That policy, generally, was aimed at conserving gold in the monetary stocks of the United States as a reserve against currency and for use in settling international balances. The private hoarding of gold was prohibited. On the other hand the use of gold for normal purposes involved in industry, profession and art was specifically recognized by the "fabricated gold" section of the Regulations. A general policy cannot be allowed to overcome specific language.

As claimant has indicated, a construction of the "fabricated gold" section as set forth by the Government would have the effect of limiting all progress in the use of gold in industry, profession and art to that which was accepted as customary in 1934, at the time of the enactment of the Gold Reserve Act. Since only customary uses of gold would be allowed under that construction, nothing could be done which was not customary, and the determination of what was customary would have to be made as of the date of the Act, namely, 1934.

The Government disputes this contention, by stating that a

"new product which contains gold in a form which is different from that ever used before, or a new manufacturing process which makes use of gold, may certainly be considered a customary use of gold under the construction being maintained by the Government."

The Court, in all candor, is at a loss to comprehend how something that is new (that is, recently created) can be customary (that is, established by common usage). The effect of the Regulation, as interpreted by the Court, would be to require that a new industrial, professional or artistic use be made customary through the use of objects other than gold, and only when such use has become customary with other products would it be permitted for golden objects, as a "customary industrial, professional, or artistic use."

Foremost among the objections of the Government to the rooster are the facts that it is solid, of a weight of 206 troy ounces, and advertised and exhibited with great emphasis upon its value. These factors are said to lead to the inescapable conclusion that the use to which the rooster was put was not a customary artistic use. The Court disagrees. Such a determination would make of the 90% requirement [§ 54.4(a) (9) (i) (a)] a nullity. It is apparent that the 90% requirement was included within the definition of fabricated gold specifically to limit the size of objects of gold, as their value relates to the amount of workmanship which went into

them. Obviously, in order to meet the requirement that more than 10% of the value of the object be in terms other than the value of the gold content, the greater the size of the object, the more valuable would have to be the artistic endeavors which went into its creation. From this point of view, it would seem extremely difficult to manufacture, for example, a 200 pound golden steer (as was suggested by the Government as a possible result of the Court's opinion here), while retaining the requirement that at least 10% of the value of the object be in terms other than the value of the gold included therein.

This is not to say that under no circumstances could a 200 pound golden steer fall within the provisions of this section of the Gold Reserve Regulations. Such a situation could exist where enough minute workmanship would be required so as to cause the manufacturing costs of such an object to rise above 10% of the value of the gold in the object, but the development of this sort of situation seems highly improbable. When objects reach such size, it seems similarly clear that a showing of good faith in the manufacture of the object would be extremely difficult. The requirements of good faith and customary artistic use, although separate, are not completely unrelated to the 90% requirement. The element of hoarding of gold would appear much more applicable in that possible situation than it does in the present instance. (The Government concedes that no attempt to hoard gold is here involved.)

The Government argues, finally, that the Court's interpretation is at odds with the legislative intent of the Gold Reserve Act. As already noted above, a general intent cannot be allowed to overcome specific language. If, indeed, Congress (or the Treasury Department, to which Congress has delegated power to enact the Gold Regulations) now intends that objects such as the rooster in this case fall within the prohibitions of the Gold Reserve Act and the Regulations enacted pursuant thereto, it would be an extreme-

ly simple matter for the appropriate authorities to enact a new regulation, specifically dealing with the general problems raised by the instant case. If this matter is as momentous as the Government now contends, this should have been done long ago. It certainly is not the province of this Court to engage in the judicial legislation which would be required to give support to the Government's contentions here. (See: In re Shear, D.C., 139 F.Supp. 217.)

It is, therefore, ordered that plaintiff's motions for judgment notwithstanding the verdict, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and, in the alternative, for a new trial, pursuant to Rule 59 of the Rules of Civil Procedure, be, and they are, each hereby denied.