In re David Jay RAY, Debtor.

CHANDLER BANK OF LYONS,
Plaintiff,

v.

David Jay RAY and Jerold E.
Berger, Defendants.

Bankruptcy No. 80–41053.
Adv. No. 81–0151.

United States Bankruptcy Court,
D. Kansas.

Jan. 20, 1983.

Thomas A. Valentine, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., for Chandler Bank of Lyons.

Dan E. Turner, Topeka, Kan., for David Jay Ray.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

### NATURE OF THE PROCEEDING:

The complaint initiating this proceeding was filed on June 25, 1981 by the Chandler Bank of Lyons, Kansas. Thereafter, by agreement of the parties, this proceeding was held in abeyance pending the appellate decision in *In Re Willie Williams*, 9 B.R. 228, 7 BCD 388, 4 CBC2d 95 (Bkrtcy.D.Kan. 1981). In *Willie Williams* this Court held that unless a secured creditor in a chapter 7 requests relief from the stay, seeks reaffirmation or takes other affirmative action to protect its secured status prior to the debtor's discharge, the secured creditor is enjoined by 11 U.S.C. § 524(a)(2) from taking any in rem action against the collateral after discharge under 11 U.S.C. § 727. Recently that appeal was dismissed on a procedural ground. The instant case presents the identical issue as was decided in the *Williams* case, i.e., are creditors' rights in personal property of the debtor enforceable after discharge where no action is taken in the bankruptcy proceeding to preserve them.

In this proceeding, counsel in this case have by agreement adopted the briefs of the parties and the amicus filed in the *Williams* appeal. Counsel have submitted the case for decision on its uncontroverted facts and those briefs.

### FACTS:

The debtor borrowed money from the Bank and in exchange granted the Bank a security interest in a 1973 Suzuki motorcycle and a 1978 Pontiac Firebird. The Bank's security interest was properly perfected. At the time of the debtor's chapter 7 filing on December 29, 1980 the loan balance was $7,133.36.

At the time of filing, the debtor sought to exempt from the estate the 1978 Pontiac Firebird as a means of conveyance pursuant to K.S.A. § 60–2304(3). The exemption, without objection, was granted pursuant to the procedures adopted in Local Rule 4004 which is adopted from the Suggested Interim Rules submitted by the Advisory Committee on Bankruptcy Rules of the Judicial Conference of the United States on August 15, 1979.

In January of 1981 the Bank received notice of the debtor's chapter 7 filing and of a projected discharge/reaffirmation date for the debtor of May 28, 1981. On February 6, 1981 the Bank filed a proof of claim reflecting a secured claim and as collateral a 1973 Suzuki and a 1978 Pontiac Firebird. The Bank did not seek relief from the § 362 stay, abandonment under § 554, reaffirmation under § 524, nor did it participate in any court proceeding or action to seek possession of its collateral prior to the debtor's discharge on May 28, 1981. At the discharge hearing it was announced that no reaffirmation agreements had been made and that an agreement to redeem had been made with one secured creditor, Vernon Schmidt. Notice of the debtor's discharge was mailed to all creditors on June 3, 1981.

On May 13, 1981 the trustee filed a no asset report and notice of intended abandonment of unadministered assets upon closing of the case. The case was routinely closed on June 3, 1981. The Bank filed its complaint initiating this proceeding on June 25, 1981.

HOLDING:

■ Subsequent to the debtors' discharge, a creditor who has taken no action to preserve its pre-filing lien rights in the debtor's personal property does not have an in personam right against the debtor and is enjoined from enforcing its lien against property of the debtor.

## CONCLUSIONS

### INTRODUCTION AND HISTORY OF REAFFIRMATION

In the commercial Garden of Eden, value (money) is transferred by a creditor to a debtor and later, per an agreement, the value is transferred back to the creditor. In the Garden of Eden, debtors always timely transfer back the value and creditors never attempt to collect more than that to which they are entitled. Mankind, however, was long ago evicted from the Garden of Eden. Debts are not always repaid; credit transactions are not always cost-free to the creditor attempting to collect debts; creditors sometimes attempt to collect more than that to which they are entitled. See generally, Leff, Injury, Ignorance and Spite—The Dynamics of Coercive Collection, 80 Yale L.J. 1 (1970) (hereinafter cited as: Leff, Coercive Collection).

Since time immemorial, creditors have sought ways to recover money that is owed at a minimum cost, leading to such collection devices as debtors' prisons, involuntary servitude and in more modern times ex parte pre-judgment attachments. Debtors have sought to acquire value in the present to be repaid at some date in the future. Though neither debtors nor creditors can survive without the other, nevertheless they have had less than harmonious relations throughout history.

The law tries to harmonize the interests of debtors and creditors, and the law of bankruptcy is but one attempt at harmony. In bankruptcy, there is a realization that a debtor generally has less assets than debts and that it would be better for all creditors to share in whatever assets a debtor has, rather than to have creditors trample each other in a race to state court to attach and execute against as much property as possible. Creditors in bankruptcy seek to receive as much as possible from the debtor's current assets, and to preserve the deficiency owed to them. Bankruptcy recognizes that involuntary servitude is unfair, and thus, the debtor is granted a fresh start after bankruptcy by leaving him with as few obligations as possible. See *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

Somewhere in bankruptcy's attempt to harmonize the interests of debtors and creditors, lies the issue of a secured creditor's in rem rights in collateral after a bankruptcy discharge. Inextricably intertwined with this issue is the evolution of reaffirmation.

At common law, it was generally believed "that a promise made in recognition of a moral obligation, arising out of a benefit previously received, was not enforceable." Comment, Reaffirmation Agreements: A Fight for Enforceability Under the New Bankruptcy Code, 12 Cumberland L.Rev. 431, 433–34 (1982) (hereinafter cited: Comment, Reaffirmation Agreements). Exceptions, however, were developed. In *Ball v. Hesketh*, 90 Eng.Rep. 541 (K.B.1697), a promise to pay a debt contracted during infancy was enforced. In *Hyleing v. Hastings*, 91 Eng.Rep. 1157 (K.B.1699), a promise to pay a debt barred by the statute of limitations was enforced. English attorneys then began arguing that a bankrupt had a moral obligation to repay discharged debts. See generally, Boshkoff, The Bankrupt's Moral Obligation to Pay His Discharged Debts: A Conflict Between Contract Theory and Bankruptcy Policy, 47 Ind. L.J. 36, 39–44 (1971) (hereinafter cited: Boshkoff, Moral Obligation). In *Trumon v. Fenton*, 98 Eng.Rep. 1232 (K.B.1777), Lord Mansfield declared that a bankrupt was morally obligated to pay discharged debts, and a new promise to pay a discharged debt was sufficient consideration to revive the enforceability of the debt.

After *Truemon*, "creditors began to use reaffirmations to escape [the effect of] the bankruptcy discharge ...." Comment, Reaffirmation Agreements, supra at 435. In an effort to control the problem, Parliament first required that the reaffirmation agreement must be in writing, 5 Geo. 4, c. 98, § 128 (1824), and later declared unenforceable all such reaffirmation agreements. 12 & 13 Vict. c. 106, § 204 (1849). Comment, Reaffirmation Agreements, supra at 435, n. 21–23.

Just before reaffirmations were banned in England, their use began to grow in the United States, helped by *Scoutland v. Eislord*, 4 N.Y.Com.L.Rep. 241, 7 Johns. 36 (1810), in which Lord Mansfield's doctrine of moral obligation was followed. Even after Congress passed the Bankruptcy Act of 1898, most states, "by statute or case law, recognized the theory that a discharge did not prohibit collection of the debt or erase the debt." Comment, Reaffirmation Agreements, supra at 436.

Often, creditors harassed debtors by using the doctrine of moral obligation and the theory that discharged debts were not erased. Sometimes, creditors would sue debtors on the discharged debt in state court "in the hope that the debtor would rely upon the discharge and fail to appear in the subsequent action." Comment, Reaffirmation Agreements, supra at 437. Other times, secured creditors would obtain a reaffirmation agreement from the debtor under threat of repossession of collateral. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 164 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Thus,

> (t)he resulting practices under the 1898 Act were similar to those experienced by the English courts in the eighteenth century. Reaffirmations tended to frustrate severely the debtor's purpose for seeking a discharge from the bankruptcy court.

Comment, Reaffirmation Agreements, supra at 437. Where the secured creditor used the threat of repossession as leverage to coerce the discharged debtor into reviving and reaffirming his entire personal liability to the creditor, the collateral was generally worth only a portion of the amount owed. The secured creditor did not want to enforce its in rem rights against the collateral. Rather, the secured creditor desired to use the threat of enforcing its in rem rights as a means of coercing the debtor into reviving his in personam obligation which had been discharged. See Boshkoff, Moral Obligation, supra at 37, n. 5.

Consider, for example, *In Re Thompson*, 416 F.Supp. 991 (S.D.Tex.1976). A secured creditor was scheduled by the bankrupt in his bankruptcy petition, and filed a proof of claim. The bankrupt was discharged, and was purportedly relieved of any personal

liability to the secured creditor. After discharge, the secured creditor began sending letters to the debtor, threatening civil and criminal action if the discharged debt was not paid. Id. at 993. The simple fact is that such coercion by creditors has always been built into the system of debtor-creditor relations, and non-judicial coercion has always been viewed by creditors as an effective and certainly inexpensive method of enforcing and reviving a debtor's in personam obligations. See Leff, Coercive Collection, supra at 5–9.

In 1970, Congress attempted to curtail creditor abuse. Under the Act of Oct. 19, 1970, Pub.L. No. 91–467, sec. 2, 14, 15, 17, 38, 58, 84 Stat. 990 (amending 11 U.S.C. sec. 11, 32, 33, 35, 66, 94 (1964)), bankruptcy courts were given exclusive jurisdiction to determine the right to and effect of a discharge, removing jurisdiction from state courts. No longer could creditors sue debtors in state court on discharged obligations hoping for default judgments. But reaffirmations by non-judicial leverage or coercion were not controlled. See, e.g., *In Re Thompson,* supra.

It is with this history of creditor coercion and abuse in mind that Congress sat down to draft § 524 of the Code. See H.R.Rep. 95–595, supra at 164.

*Section 524:*

Section 524 provides:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect, recover or offset any such debt as a personal liability of the debtor, or from property of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523 or 1328(c)(1) of this title, or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

.    .    .    .    .

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable non-bankruptcy law, whether or not discharge of such debt is waived, only if—

(1) such agreement was made before the granting of the discharge under section 727, 1141, or 1328 of this title;

(2) the debtor has not rescinded such agreement within 30 days after such agreement becomes enforceable;

(3) the provisions of subsection (d) of this section have been complied with; and

(4) in a case concerning an individual, to the extent that such debt is a consumer debt that is not secured by real property of the debtor, the court approves such agreement as—

(A)(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and

(ii) in the best interest of the debtor; or

(B)(i) entered into in good faith; and

(ii) in settlement of litigation under section 523 of this title, or providing for redemption under section 722 of this title.

(d) in a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, or 1328 of this title, the court shall hold a hearing at which the debtor shall appear in person. At such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section, then at such hearing the court shall—

(1) inform the debtor—

(A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

(B) of the legal effect and consequences of—

(i) an agreement of the kind specified in subsection (c) of this section; and

(ii) a default under such an agreement;

(2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(4) of this subsection, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

This section has three effects. First, the concepts of moral obligation and revival of discharged debts are eliminated. After discharge, regardless of waiver to the contrary, the debtor cannot become obligated for the entire debt on a theory of moral obligation, and the debtor cannot waive this right. H.R.Rep. 95–595, 95th Cong., 1st Sess. 163–64, 365–66 (1977).

Second, the creditor is enjoined from all forms of judicial and nonjudicial attempts to collect the discharged debt from the debtor or the debtor's property.

Third, in the case of reaffirmations, the Court is required to police the agreements pertaining to personalty signed by the debtor and, in agreements pertaining to personalty and real property, administer a *Miranda*-like warning, explaining to the debtor his rights, options and obligations under the agreement. Section 524 does not prevent a debtor from making "voluntary" payments to a creditor after discharge, H.R. Rep. 95–595, supra, at 164, U.S.Code Cong. & Admin.News, p. 6125, but it:

> guarantees that debtors may repay a portion or all of a discharged debt in a voluntary situation, without any fear of reaffirming the whole of the debt and being subject to the same court process that resort to the bankruptcy laws was designed to prevent.

Id.

In its *Miranda*-like warning to the debtor under § 524(d), and in its policing of reaffirmations under § 524(c)(4), the Court must find the personalty reaffirmation is in the best interest of the debtor, § 523(c)(4)(A)(ii), and for all reaffirmations the Court must explain the "legal effect and consequences" of the agreement. § 524(d)(1)(B).

Certainly, in scrutinizing the proposed reaffirmation, the Court must compare the debtor's plight under the proposed reaffirmation with the debtor's plight absent a reaffirmation, to determine if reaffirmation is in the debtor's best interest. There will be times when,

> the value of the (collateral) . . . has declined since purchase by more than the amount by which the principal balance of the loan has been reduced . . . .

Boshkoff, Moral Obligation, supra at 37, n. 5. In bankruptcy, the secured party has a secured claim for the value of the debtor's interest in the collateral. 11 U.S.C. § 506(a). If the collateral is worth significantly less than what is owed, the debtor may be better off surrendering the collateral and purchasing replacement collateral of equivalent quality and value; or the debtor may be better off redeeming the collateral for value under 11 U.S.C. § 722. See, e.g.,

*In Re Blount,* 4 B.R. 92, 6 BCD 618, 2 CBC2d 373 (Bkrtcy.M.D.Tenn.1980); *In Re McGrann,* 6 B.R. 612 (Bkrtcy.E.D.Pa.1980). The prospects of redemption may be more feasible in jurisdictions allowing redemption through installment payments rather than a lump sum payment. See *In Re Davis,* 15 B.R. 118, 8 BCD 363, 5 CBC2d 703 (Bkrtcy.C.D.Ill.1981); *In Re Hall,* 11 B.R. 3, 7 BCD 276 (Bkrtcy.W.D.Mo.1980); but see *In Re Carroll,* 11 B.R. 725, 8 BCD 504, 4 CBC2d 1042 (Bkrtcy.App. 9th Cir.1981); *In Re Miller,* 4 B.R. 305, 6 BCD 436, 2 CBC2d 259 (Bkrtcy.E.D.Mich.1980). See also proposed Senate Bill 2000.

Nearly all courts and commentators have agreed that there cannot be a legally enforceable reaffirmation without the § 524 discharge/reaffirmation hearing setting. Where there is no reaffirmation, however, a conflict arises, over the effect on a creditor's right of lien enforcement against the debtor's property after discharge.

THE WILLIE WILLIAMS HOLDING AND THE AFTERMATH:

Under 362(a)(5), a secured creditor and its claim are subject to the automatic stay until discharge is granted or denied, unless the Court grants relief from the stay. 11 U.S.C. §§ 101(9)(A), 101(4)(A), 362(a)(5), 362(a)(4), 362(c), 362(d), 554; H.R.Rep. 95–595, 95th Cong., 1st Sess. 343 (1977).

Upon filing a bankruptcy petition, all property interests of the debtor pass to the estate. 11 U.S.C. § 541. The debtor can then receive property from the estate, through exemption § 522(b), H.R.Rep. 95–595, 95th Cong., 1st Sess. 368 (1977), or receive property through abandonment. § 554. Property secured by a lien may be subject to the lien avoidance provision of § 522(f), reaffirmation of the obligation under § 524(c) and (d), or redemption under § 722. A secured creditor may request relief from the automatic stay to foreclose its security interest, seek replevin, abandonment under § 554, disposition under § 725, reaffirmation or some other form of protection of its secured position.

If the secured creditor does nothing before discharge is granted, this Court held in

*Willie Williams* that § 524(a)(2) enjoins a creditor from enforcing its lien, or in rem rights, against property if the underlying debt is discharged. In arriving at this holding, the Court attempted to apply § 524 as it was written, and resolve potential conflicts between several statements made in the legislative history of other Code sections and § 524. See, e.g., legislative history of § 506(d), § 522(c). The Court further touched upon issues of constitutionality and statutory construction.

Since the *Willie Williams* decision, a number of cases have held and a number of commentators have stated that § 524(a)(2) does not alter a secured creditor's in rem rights in collateral after the debtor receives a discharge, even though neither relief from the stay nor replevin was granted and a reaffirmation agreement was not executed or approved by the Court. See, e.g., *In Re Weathers,* 15 B.R. 945, 8 BCD 524, 5 CBC2d 935 (Bkrtcy.D.Kan.1981) (Franklin, J.); *In Re Cassi,* 24 B.R. 619, 9 BCD 1022 (Bkrtcy. N.D.Ind.1982); *In Re Sawyer,* 18 B.R. 661, 8 BCD 1168 (Bkrtcy.D.Idaho 1982); *In Re McGray,* 21 B.R. 587 (Bkrtcy.D.Me.1982); *In Re Rosenow,* 22 B.R. 99 (Bkrtcy.W.D.Wash. 1982); *In Re Andrews,* 22 B.R. 623, 9 BCD 589 (Bkrtcy.D.Del.1982); *In Re Nason,* 22 B.R. 690, 9 BCD 599, 7 CBC2d 77 (Bkrtcy.D. Me.1982); *In Re Fitzgerald,* 20 B.R. 27 (Bkrtcy.N.D.N.Y.1982). See also *In Re Bullock,* 11 B.R. 73 (Bkrtcy.E.D.Va.1981); *In Re Geiger,* 12 B.R. 410 (Bkrtcy.E.D.Wisc. 1981); Kennedy, Secured Creditors Under the Bankruptcy Reform Act, 15 Ind.L.Rev. 477, 497 (1982); 3 Collier on Bankruptcy, ¶ 524.01 (15th Ed.1982).

Under the system espoused by these courts and commentators, secured creditors will rarely reaffirm or participate in the bankruptcy proceeding, just as they rarely participated under the Act. See, F. Kennedy, Priorities and Liens, in I CLE Bankruptcy and the Chapter Proceedings 163, 177–82 (1976). After discharge, the secured creditor's in rem rights in the collateral remain. Section 524 does not enjoin the secured creditor from repossessing the collateral or expressing an intent to repossess the collat-

eral, though Congress specifically mentioned any act to collect including threats of repossession are prohibited. See H.R.Rep. 95–595, supra, at 366. The collateral may be necessary for the debtor's existence, and not knowing any of the other options, the debtor may decide to forestall repossession by commencing coerced payments of the entire discharged in personam obligation.

The result of such a system only highlights what this Court previously has stated in this opinion: the properties of coercion and leverage are simply built into the system of debtor-creditor relations. The very ability to repossess is coercive. The individual debtor is not the equal of the creditor, usually a commercial financial institution, there is not equality of bargaining power, and the debtor is usually uncertain of his ability to obtain replacement of the same quality property for a like cost. Such debtors are not usually leaders and dissenters, but followers. Most debtors, even though they just went through a bankruptcy proceeding, do not realize the consequences of their acts or their options. See D. Cowans, Bankruptcy Law and Practice § 893 (1963).

It cannot be denied that repossession is a very effective, if not the most effective, collection device. If the debtor voluntarily agrees after discharge to pay his in personam obligation in order to avoid repossession, no longer is

> [b]ankruptcy ... the sanctuary for hapless debtors which Congress intended. The bankrupt, instead of receiving by virtue of his discharge 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt ...' finds himself still entangled with a former creditor.

*Reitz v. Mealey,* 314 U.S. 33, 41, 62 S.Ct. 24, 29, 86 L.Ed. 21 (1941) (Douglas, J. dissenting).

Is this the result Congress intended when it drafted § 524? This Court does not believe so. This Court believes Congress intended by § 524 to once and for all control *all* post bankruptcy collection devices, and truly give the debtor a fresh start. At the same time, this Court believes Congress intended to protect and preserve the rights of those secured creditors who expended the minimal effort of appearing before the bankruptcy court and requesting in the alternative relief from the stay to foreclose a security interest or for replevin, reaffirmation or some other similar form of relief. The portion of this opinion which follows is an expansion of the rationale previously given in *Williams* and which support the instant decision in David Jay Ray. In reaching its conclusion, this Court, and other courts reaching a contrary conclusion review §§ 524, 522 and 506.

## STATUTORY CONSTRUCTION:

■ The purpose of statutory construction is to discover the true meaning of the law. *Utah Junk Co. v. Porter,* 328 U.S. 39, 66 S.Ct. 889, 90 L.Ed. 1071 (1946). It should only be used in case of doubt and not to create doubt. *Helvering v. Northwestern Nat'l Bank and Trust Co.,* 89 F.2d 553 (8th Cir.1937). Where the statute is clear on its face there is no need to use rules of construction. *United States v. Bryant,* 671 F.2d 450 (11th Cir.1982).

### § 524

■ It is stated in § 524(a)(2) that an injunction is issued upon discharge, not just against collection of unsecured debt, but against any debt. The injunction prevents *any act,* not just acts by unsecured creditors or acts in personam. The injunction prevents recovery from property of the debtor, not just unencumbered property or property the debtor acquires after his petition is filed. Thus, it appears from a reading of the statute that the statutory language is clear and unequivocal: all acts to collect from the debtor or his property are prohibited. Furthermore, § 524(c) states that an agreement, the consideration for which is based upon a discharged debt, is not enforceable unless approved by the court. A security agreement creating a security interest is an agreement. Section 524(c) does not say agreements except security agreements, but says all agreements, which would include security agreements, are un-

enforceable unless approved by the court. Section 524(c)(4), in fact, covers all consumer debt except that secured by real property. Again, the language is clear and unequivocal. As a result of § 524's clarity and lack of ambiguity, the need for statutory construction would seem to be nil.

Be that as it may, courts and commentators that have addressed the instant issue have expressly or impliedly, wittingly or unwittingly, used rules of statutory construction to construe §§ 524(a)(2) and (c) to mean something other than what is clearly written and commonly understood.

■ The use of the phrase "or from the property of the debtor" has been termed an "unfortunate phrase" by one commentator. See Kennedy, Secured Creditors Under the Bankruptcy Reform Act, 15 Ind.L.Rev. 477, 497 (1982). The "unfortunate" choice of words was made by Congress and there is a presumption that Congress meant what it said and that it intended to use the words it used. *United States v. Jones,* 542 F.2d 661 (6th Cir.1976); *United States v. Goldenberg,* 168 U.S. 95, 103, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897). Courts should neither speculate as to possible qualifications in the minds of the legislature that may have existed when the statute was drafted nor restrict the statute because the legislature may have used an ill advised or improper word to express its meaning. *Vroon v. Templin,* 278 F.2d 345 (4th Cir.1960); *United States v. One Solid Gold Object in Form of a Rooster,* 208 F.Supp. 99 (D.Nev.1962).

*Collier,* soon after the publication of *Willie Williams,* stated that property of the debtor in § 524 meant property acquired by the debtor after commencement of the bankruptcy case. 3 Collier on Bankruptcy 524.01, at 524–08, (15th Ed. 1981). The exact phrase used in § 524(a)(2) is used in § 362(a)(5). Although these phrases were both used in the context of staying creditor lien enforcement, Collier only ascribes a limited meaning to the words in § 524(a)(2).

■ As previously stated, there is a presumption that Congress meant what it said. *United States v. Jones,* supra. Further,

Courts must not assume a legislative intent in plain contradiction to the words used by the legislature. *General Motors Corp. v. Blevins,* 144 F.Supp. 381 (D.Colo.1956). If Congress intended the word property to mean after acquired property, Congress would have said so. If one looks at § 524(a)(3), the very next section after § 524(a)(2), one will find that Congress did in fact refer to property of the debtor acquired after commencement of the case. Thus it would appear Congress was not only aware of such language but was keenly aware of where it wished it used. Yet it was not used in § 524(a)(2). Additionally, even if § 524(a)(2) meant after acquired property, § 541 provides generally that all interests of the debtor in property as of the commencement of the case become property of the estate.

> ... '(A)ll' the debtor's property interests, including exempt property, enter the estate. The bankrupt carves exempt property out of the estate.

Rendleman, Liquidation Bankruptcy Under the '78 Code, 21 William & Mary L.Rev. 575, 595 (1980). *In Re Ford,* 3 B.R. 559, 568 (Bkrtcy.D.Md.1980), affirmed, 638 F.2d 14 (4th Cir.1981); *In Re Upright,* 1 B.R. 694, 702 (Bkrtcy.N.D.N.Y.1979). H.R.Rep. 95–595, 95th Cong., 1st Sess. 368 (1977). Upon filing a chapter 7 petition, the debtor, with limited exceptions not herein applicable, is divested of all property interests owned at the time the petition was filed. Thus, the debtor acquires his property after commencement of the case by exemption, abandonment, purchase or gift. It is all legally and technically acquired after commencement of the case.

■ Collier in a recent supplement has stated that this Court's reading of § 524(a)(2) is incompatible with the concepts underlying the Code. Collier on Bankruptcy, supra at 524–14. In fact, there has been a definite change in the Code as compared to the Act. The language of § 524(a)(2) does in fact differ from § 14f of the Act. It is presumed the legislature acted with full knowledge of the prior law and conditions that existed under the prior law. *Cannon v. University of*

*Chi.,* 441 U.S. 677, 697–98, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979). By enacting a different statute, it is presumed the legislature intended a change in the existing law. *Klein v. Republic Steel Corp.,* 435 F.2d 762 (3rd Cir.1970). Much of this decision is devoted to an explanation of the compatibility of its holding with the underlying concepts of the Code. The Court sees no incompatibility with the undefined "concepts" to which Collier refers.

Collier also stated that a literal reading of § 524(a)(2) is improper. In regard to the comment that this statute should not be read literally, if not literally, what then? Have we reached the point where Congress writes our laws in language allegorical or perhaps apochraphal or even metaphorical? It is hoped not; straight forward common English is apparently difficult enough.

In *In Re Weathers,* supra, the Court states that § 524(a)(2) is ambiguous on its face in light of language of other statutes. The Court therefore determined that certain words of § 524 must have a statutorily unenunciated limited meaning.

As previously pointed out herein, when the language of § 524(a)(2) is given its commonly accepted meaning, there is no ambiguity. Certainly the same language has caused no such difficulty in § 362(a)(5). On its face the statute is clear and unequivocal. Though courts should not refuse to consider persuasive evidence of legislative intent on the grounds that reasonable men could not differ on the meaning of statutory language, the rules of construction should be used only when doubt exists, and not to create doubt. *Helvering v. Northwest National Bank and Trust,* supra; *United States v. Dickerson,* 310 U.S. 554, 561–562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356 (1940).

■ What *Weathers* actually does is to determine that even if the language of § 524 and its history are clear, there is a possible conflict with § 506 and § 522 and more particularly with the legislative history of § 506 and § 522. Thus *Weathers* determines that § 524 must be construed in light of these other statutes' legislative history. An ambiguity in the legislative history, however, is insufficient basis for ignoring clear statutory language. *Ciampa v. Secretary of Health and Human Servs.,* 687 F.2d 518 (1st Cir.1982). Based on the legislative history of §§ 506 and 522, *Weathers* determines the word property is ambiguous, and proceeds to modify the language of § 524 by limiting the meaning of the word property to property upon which a lien has been avoided pursuant to § 522(f). Secured creditors affected by discharge are limited to those who are no longer secured by virtue of a § 522(f) lien avoidance.

■ The word property, however, is not ambiguous. In *Button v. Drake,* 302 Ky. 517, 195 S.W.2d 66, (1946), the court, when faced with a statute containing the word "property", stated "[w]e must look to the authorities to determine whether the terms 'property' and 'all property' are of such doubtful meaning as to justify a resort to contemporaneous construction." 195 S.W.2d at 68. The court then determined that property was the most comprehensive of all terms that could be used in a statute and was neither ambiguous nor subject to any construction. It was a "nomen generalissimum" with definite meaning referring to any valuable right a person has in relation to something as distinguished from the thing itself. Other courts have also recognized the precision and lack of ambiguity of the word property. See *First Charter Land Corp. v. Fitzgerald,* 643 F.2d 1011, 1014–15 (4th Cir.1981).

Thus, this Court does not attribute a new and radical meaning to the words contained in § 524, but rather reads the statute, and each and every word contained in the statute, the way courts have always read similar words in statutes.

LEGISLATIVE HISTORY OF § 524:

The Bankruptcy Act of 1898 was written in "the horse and buggy era of consumer and commercial credit." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 3 (1977), U.S.Code Cong. & Admin.News, p. 5965. In the 80 years that followed, numerous changes in commercial law developed, not the least of which was the drafting of the Uniform

Commercial Code and its enactment in 49 states. The 1978 Bankruptcy Code was drafted with these commercial law developments in mind to protect "both the debtor and secured creditors during a bankruptcy case." H.R.Rep. No. 95–595, supra at 5, U.S.Code Cong. & Admin.News, p. 5966. Before examining the legislative history of § 524, a brief review of a few basic tenets of modern commercial personal property law will prove helpful.

A secured party is:

a lender, seller or other person in whose favor there is a *security interest*....

U.C.C. § 9–105(1)(m) (emphasis added). A security interest is:

an interest in personal property or fixtures which secures payment or performance of an obligation.

U.C.C. § 1–201(37). Conversely, an unsecured party is a creditor to whom money is owed, but who is not granted a security interest in property. There is a naked debt; nothing more.

U.C.C. § 9–503 provides, "a *secured party* has on default the right to take possession of the collateral ...." (emphasis added). A basic tenet of modern commercial transactions is that an unsecured party may attach, execute or levy but simply does not repossess. ONLY A SECURED PARTY REPOSSESSES.

What is the right to repossess? It is, the secured creditor's ultimate weapon ...; in some instances the threat of repossession alone will be sufficient to persuade a misguided debtor to mend his way ("If you don't pay up, I'll exercise my right to repossess your favorite hunting dog in whom I have a security interest").

J. White & R. Summers, Uniform Commercial Code § 26–5, at 1094 (2nd Ed. 1980). Furthermore, it is a weapon the secured party does not actually want to use. Gilmore & Axelrod, Chattels Security: I, 57 Yale L.J. 518, 530 (1947).

With these commercial law concepts in mind, and with the expressed congressional intent to draft a bankruptcy law in conso-nance with modern commercial law, an examination of 11 U.S.C. § 524's history is revealing. Congress stated that § 524,

has been expanded over a comparable provision in Bankruptcy Act § 14f to cover *any act to collect,* such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, *threats of repossession,* and the like.

H.R.Rep. 95–595, supra at 365–66, U.S.Code Cong. & Admin.News, p. 6321. Clearly in this passage, Congress is stating it no longer wants secured parties to threaten repossession of collateral in which the secured party had a security interest in an attempt to collect a discharged debt. This can be the passage's only meaning because only secured parties can repossess. Congress' concern over the "threat of foreclosure" by secured creditors is mentioned time and time again in the legislative history. See, e.g., H.R.Rep. 95–595, supra at 127, 163, 171–73. Thus, Congress legislated a disarmament of the secured creditor's strongest weapon: the threat of repossession of collateral which secured a discharged debt. Yet the element of threat of repossession and the incentive it gives debtors to pay is in some cases the paramount reason security is taken. See W. Davenport & D. Murray, Secured Transactions 1 (1978).

The Supreme Court has also recognized that a debtor's right to possess and enjoy property in which a creditor has a security interest is a substantial property right protected by the due process clause. *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). Thus, because the word property is unambiguous and because the right to possession, use and enjoyment are substantial property rights, a secured creditor that repossesses property in which it has a security interest is acting against the debtor's property to satisfy a discharged obligation. That is why creditors take security interests: to ensure that obligations will be satisfied.

The Supreme Court has also acknowledged that in rem judgments affect personal rights, and has stated that rigid distinc-

tions between in rem and in personam rights may no longer be valid. *Shaffer v. Heitner,* 433 U.S. 186, 205–06, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). The Supreme Court rejected "[t]he fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property. . . ." Id. at 212, 97 S.Ct. at 2584.

If it is true as some cases and commentators believe, that Congress intended lien enforcement after discharge without reaffirmation or relief from the stay before discharge despite expressly prohibiting the threat of repossession to coerce payments and any act or commencement of an action to collect, one must reach the conclusion that Congress left secured parties only two choices: (1) repossess the collateral *without threat of repossession* after discharge; or (2) write the whole matter off as a bad debt. Unless the secured creditor has very poor business judgment, the creditor will always opt for choice number one, to minimize its losses. Thus, under the *Weathers*-type holding, one should be able to examine all chapter 7 discharged debtors and discover that all the collateral that they granted creditors security interests in was repossessed shortly after discharge. This, of course, is not the actual course of events. Debtors are continuing to pay the full pre-filing debt and collateral is not being repossessed en masse. Why then are debtors continuing to pay secured creditors after their discharge? Someone must have explained to the debtor that if payments are not continued under the pre-filing agreement, the collateral will be repossessed. And who would give such an explanation? Not the Bankruptcy Court. Not the trustee. In many, if not most, cases, the word is received from the secured creditor. Call it what you will. Call it a suggestion, call it friendly advice, call it an explanation. But whatever else you call it, call it a less than voluntary collection of a discharged debt by a secured creditor. It is coercive; it is leverage; it is tantamount to threatened repossession; it is an act to collect; it is what secured creditors have always done after a bankruptcy discharge; it is in con-

travention of Congressional mandate, and it accomplishes exactly what Congress sought to outlaw.

## § 506 AND LEGISLATIVE HISTORY:

Section 506(d) provides:

To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

(1) a party in interest has not requested that the court determine and allow or disallow such claim under section 502 of this title; . . .

The legislative history of § 506(d) states: Subsection (d) *permits* liens to pass through the bankruptcy case unaffected. H.R.Rep. 95–595, 95th Cong., 1st Sess. 357 (1977), U.S.Code Cong. & Admin.News, p. 6313 (emphasis added). This phrase does not appear in the Senate legislative history, or the October 6, 1978 discussion of § 506 by Senator DeConcini as reported in the Congressional Record at S 17411, or the Senate Committee on Finance discussion of § 506(d) in S.Rep. No. 95–1106, 95th Cong., 2nd Sess. 31 (1978).

The statute simply states that liens not avoided are valid in the bankruptcy proceeding. The legislative history is permissive and allows liens to pass through a bankruptcy proceeding unaffected. Nothing in this decision or in *Willie Williams* is violative of this concept. Both decisions permit valid liens to pass through the bankruptcy proceeding unaffected. All creditors must do is to appear before the discharge and seek reaffirmation, stay relief, or some other form of relief. In order for subsections (c) and (d) of § 524 concerning reaffirmation to be operable and in order for this decision to be based on anything but a moot point, pre-filing liens must have the opportunity to be viable both during and after the bankruptcy proceeding.

In addition, § 506(d) addresses the issue of *voiding* liens, whereas § 524 addresses the issue of *enjoining* collection efforts, and of rendering agreements *unenforceable.* It is clear Congress attributed different meanings to the words "void" and "unenforceable" as evidenced by § 506(d) and § 524,

and this Court likewise attributes different meanings to these words. The creditor's lien in *Willie Williams* was not voided, but rather was rendered unenforceable by the creditor's inaction. The creditor was permanently *enjoined from enforcing* its lien. After the *Willie Williams* decision was rendered, liens in this Court in fact are permitted to, and do, pass through bankruptcy unaffected, if the creditor takes a few minimal steps to protect its interest. Thus, this Court does not believe its decisions, carrying out the clear language of § 524, conflict with the statutory language or legislative history of § 506(d).

§ 522(c) AND LEGISLATIVE HISTORY:

Section 522(c) provides:

> ... property exempted ... is not liable during or after the case for any debt of the debtor that arose ... before the commencement of the case except—
>
> .     .     .     .
>
> (2) a lien that is—
>
> (A) not avoided under section 544, 545, 547, 548, 549, or 724(a) of this title; [or]
>
> (B) not voided under section 506(d) of this title, ...

This subsection merely states that exemption alone does not avoid an otherwise valid lien.

The legislative history states:

> The bankruptcy discharge will not prevent enforcement of valid liens. The rule of *Long v. Bullard,* 117 U.S. 617 [6 S.Ct. 917, 29 L.Ed. 1004] (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property. Cf. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 583 [55 S.Ct. 854, 860, 79 L.Ed. 1593] (1935).

H.R.Rep. 95–595, 95th Cong., 1st Sess. 361 (1977); S.Rep. 95–989, 95th Cong., 2nd Sess. 76 (1978), U.S.Code Cong. & Admin.News, p. 6317.

*Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886) was a one page opinion by Chief Justice Waite written when debts secured by liens could only be proved for the unsecured deficiency remaining after deducting the value of the security. Secured claims could not be proved and/or allowed in the bankruptcy proceeding, and thus the bankrupt's discharge of provable and allowable debts did not affect a secured creditor's secured claim. Furthermore, *Long v. Bullard* was decided in a time when bankruptcy courts did not have jurisdiction to enforce rights against property claimed as exempt by the bankrupt. See, e.g., *Lockwood v. Exchange Bank,* 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903), see also *In Re Whitney,* 1 BCD 1205, 5 CBC 494 (W.D.Wis.1975). In *Long v. Bullard,* the Supreme Court held that discharge did not affect the secured, unprovable claim, the creditor had not released its security, and that,

> [t]he setting apart of the homestead to the bankrupt ... did not relieve the property from the operation of liens created by contract before the bankruptcy.

Id. 117 U.S. at 621, 6 S.Ct. at 918. The Supreme Court never addressed the issue of whether all liens are enforceable after bankruptcy discharge, and never addressed the issue of whether provable secured claims that could be, but were not, enforced in the bankruptcy proceeding are enforceable after bankruptcy discharge.

Under the Bankruptcy Code, the concept of proveability has been discarded, secured claims are filed, and the Bankruptcy Court has jurisdiction to enforce liens on exempt property. With this in mind, what did Congress mean when it stated that discharge "will not prevent enforcement of valid liens" and when Congress "accepted" the rule of *Long v. Bullard?*

■■■■ It is this Court's opinion that its holding in *Willie Williams* is in concert with the legislative history of § 522, and is the only way to read the legislative history of § 522(c) in concert with the statutory language and legislative history of § 524. It is the duty of the Court to reconcile the various parts of an act that may conflict to make them consistent and not mutually destructive. 82 C.J.S. Statutes, § 346 at 714–16 (1953). Under *Willie Williams,* it is not

the discharge that "prevents" enforcement of valid liens. Valid liens are quite enforceable if creditors protect their rights during the bankruptcy proceeding. The only thing that prevents enforcement of valid liens under this Court's holding is creditor apathy, inaction or indifference. Thus, liens are not affected by discharge (satisfying the legislative history of § 522(c)) as long as secured creditors take very minimal protective steps (satisfying § 524(a)(2), (c), (d) and satisfying the legislative history of § 524). Moreover, the actual rule of *Long v. Bullard* is not contradicted. This Court agrees that the mere claiming of exemptions by the debtor does not relieve property from the operation of contractual, prebankruptcy liens. Were it not for the fact that liens do survive exemption unless avoided by the sections mentioned in § 522(c) or by § 522(f), there would be no reason for a discussion of reaffirmation and lien enforceability.

Any other reading of § 524 and § 522(c) and their respective legislative histories has three results. First, the word "repossession" in the legislative history of § 524 must be ignored. Second, the unambiguous word "property" in § 524(a)(2) must be either ignored or given a contrived and strained meaning. Third, if the history of § 522(c) is read to say that secured creditors do not have to take minimal steps during the bankruptcy to protect themselves, then § 524(c) and (d) become virtually useless sections. Secured creditors would not have to reaffirm, as in fact they are discouraged from doing in some Districts. The statement in § 524(c) and (d) that agreements between debtors and creditors the consideration for which is based on dischargeable debts, are unenforceable unless approved by the bankruptcy court, is either ignored or the word agreement is somehow read to exclude security agreements. In short, unless a court is willing to mortally wound § 524 and perform surgery on its vital parts, the only way to read the language and history of § 522(c) and the provisions of § 524 in concert is by giving to both the effect a literal reading of their language demands when read in the context

and confines of what is actually being dealt with and accomplished by each section. In this manner, meaning and significance is given as it must be to all parts and provisions of an Act. See *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973).

*Constitutionality:*

■ Congress has the ability to affect property rights, in this case, a security interest or lien of a creditor, created under state law:

> Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and perfected. But if Congress is acting within its bankruptcy powers, it may authorize the bankruptcy court to affect those property rights, provided the limitations of the due process clause are observed.

*Wright v. Union Central Life Ins. Co. (Wright II)*, 304 U.S. 502, 518, 58 S.Ct. 1025, 1034, 82 L.Ed. 1490 (1938).

■ The due process clause of the 5th Amendment requires that no one's property shall be taken without notice and an *opportunity* to be heard. See, e.g., *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Holden v. Hardy*, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780 (1898).

According to the precedents, a lien holder's rights can be affected, modified, transferred or enjoined in bankruptcy. Safeguards must be provided to protect the rights of secured creditors throughout the proceedings, notice and an opportunity to be heard must of course be provided, and whatever the outcome, it must be fundamentally fair.

This Court reads the plain and literal language of § 524(a)(2) as an injunction authorized by Congress. As this Court has repeatedly stated, a secured creditor can ask for and be granted the right to enforce its lien at any time before discharge or make an application for reaffirmation. Creditors often make their application in

the alternative. These procedures are two of the simplest, least time-consuming, and easily the most effective of all bankruptcy procedures. The debtor upon application by the creditor, must either reaffirm or surrender the collateral. Upon application, the Court will not allow the debtor to retain the collateral without reaffirming. The refusal to reaffirm upon application for reaffirmation by the creditor is cause to grant relief from the stay under § 362(d) because of the injunction under § 524(a)(2). The creditor need not agree to reaffirmation and can seek relief from the stay, reclamation, and foreclosure of its security interest. In this instance, the debtor can redeem for value under § 722. Thus, there are a number of effective options available to the creditor throughout the proceeding. There also exist a number of options from which a debtor must choose. The choice, however, is a non-coercive, informed choice. The opportunity to be heard and protect security interests is certainly present.

Finally, in examining the interests of debtors and creditors, the Court believes its holding is fundamentally fair. In rem rights have long been subject to modification, alteration or injunction and otherwise in need of protection, and secured creditors have always taken steps to protect their rights. See *Wright v. Vinton Branch of the Mountain Trust Bank* (Wright I), 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); *Wright v. Union Cent. Life Ins. Co.* (Wright II), 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940). The procedure to protect a creditor's right is neither difficult, complicated nor too inaccessible and there is outlined substantial protection under § 362 and § 524.

There is clearly only a modicum of burden on secured creditors under this holding. Furthermore, to the benefit of creditors, either collateral is returned at a relatively early time or a binding in personam agreement is executed. This is what creditors with some knowledge of debtor-creditor relations have always sought.

The fairness of this decision to the debtor is abundantly apparent. No longer can secured creditors lay in the weeds only to coerce payments after discharge by using the leverage of a threatened repossession or by bringing of a lien foreclosure proceeding. No longer will discharged debtors unwittingly agree to voluntary payments unless the payments are truly voluntary—that is, totally without threat, coercion or leverage. Even if an ambiguity exists in § 524(a)(2) as some courts and commentators seem to believe, the ambiguity should be resolved in the debtor's favor. Based on these considerations, the Court is of the opinion that there is no constitutional infirmity in this holding and that it is fundamentally fair and in complete consonance with past Supreme Court holdings.

SUMMARY:

■ This Court finds the language of § 524 clear and unambiguous, thus resort to rules of statutory construction is improper. The language of §§ 506(d), 522(c) and 524 is not in conflict. These sections when read separately and as contributing parts of the whole state that a pre-filing lien which is not avoided during the bankruptcy proceeding remains valid, though property upon which it falls is exempted, and enforceable, when the underlying agreement is reaffirmed, subsequent to discharge. It is the Court's belief that the problems seen to be created by its view expressed in *Willie Williams* and now in this opinion are not with the statutes but in the break with tradition caused by the language added to § 524. As Thomas Paine observed in 1776 "a long habit of not thinking a thing wrong gives it a superficial appearance of being right, and raises at first a formidable outcry in defense of custom." Introduction to Common Sense (American Heritage Series Ed. 1953).

Even if one were to look at the legislative history of the sections, at most they are ambiguous, and thus not dispositive. The ambiguity is created by seemingly conflicting language in the history of § 522(c) and § 524. As earlier pointed out, part of this ambiguity resulted from a misreading of the holding in *Long v. Bullard,* supra. An ambiguity or conflict in the legislative history of various sections is not sufficient

basis for avoiding clear statutory language. See *Ciampa v. Secretary of Health and Human Services,* supra. Ambiguities or conflicts in the Code are to be resolved in favor of the debtor, not the creditor. The Code is to be liberally construed to give the debtor the full measure of relief afforded by Congress. See *Wright v. Union Central Life Insurance Co.* (Wright II), 311 U.S. 273, 278–79, 61 S.Ct. 196, 199–200, 85 L.Ed. 184.

The Court therefore determines that the creditor's lien is unenforceable and the relief requested is accordingly denied.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.